**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                  No. 21-cr-01713-DHU

RAMON CHAVEZ,

    Defendant.

**MEMORANDUM OPINION AND ORDER**
**ON MOTION TO SUPPRESS**

    This matter is before the Court on Defendant's Motion to Suppress Statements and Physical Evidence and Request for an Evidentiary Hearing. *See* Doc. 26. The Court held a hearing on the motion on June 29, 2022. The Government and Defendant submitted their respective exhibits to the Court on July 18, 2022.[1] *See* Docs. 36 and 37. Having considered the motion, briefs, record evidence, arguments, relevant law, and being otherwise fully informed, the Court concludes that the motion is **GRANTED**.

**FACTUAL FINDINGS**

    The Court makes the following findings of fact, as supported by the record, in accordance with Rule 12(d) of the Federal Rules of Criminal Procedure. The Court makes additional findings of fact as needed in subsequent sections of this Memorandum Opinion and Order.

    On October 3, 2021 at 12:05 p.m., a 911 call was made regarding an incident at 6413 Maplewood Court, SW, Bernalillo County, New Mexico. *See* Computer Aided Dispatch Report, Government's Exhibit ("Pl.'s Ex.") 2 at 9; *see also* Motion Hearing Transcript[2] ("Mot. Hr'g Tr.")

---

[1] The Government re-submitted its exhibits in August 2022 to the Court due to a technical issue with the Government's initial submission.

[2] This Memorandum Opinion and Order cites to the court reporter's unofficial transcript. All page citations are subject to change on the official, edited version of the transcript.

at 69:12-21.  The call was classified by a police dispatcher as a "residential burglary in progress,"
also known as a "27-5 RP."  *Id.* at 42:19-25; *see* Pl.'s Ex. 2 at 9.  At 12:08 p.m., Bernalillo County
Sheriff's Department Deputies David Schlanger and Brandon Reynolds were dispatched to the
Maplewood Court address in response to the 911 call.  *See id.* at 37:4-8, 38:24-25-39:1-4, 75:3-5,
109:6-12, 110:12-19.

The deputies received information about the nature of the 911 call from the dispatcher on
their in-vehicle computers and over police radio.[3]  *See* Mot. Hr'g Tr. at 39:13-25-40:1-12, 44:1-
19, 45:14-49:9.  The calling party reported there was a "male at residence taking stuff off porch."
*Id.* at 45:14-18; Pl.'s Ex. 2 at 2.  At 12:07, the calling party reported, "taking stuff out of shed" and
"says landlord once [sic] him out of there."   Mot. Hr'g Tr. at 45:22-46:6; Pl.'s Ex. 2 at 2.  The
deputies were given the following description related to the call:

> 40 YO SMA
> 5'8 145 LBS
> TATTOOS ON FACE
> BLK JNS ON SHIRT

Pl.'s Ex. 2 at 2; *see* Pl.'s Ex. 2 at 46:7-2.  "SMA" stands for "Spanish male adult."  Mot. Hr'g Tr.
at 46:22-47:2.  The dispatcher subsequently corrected the description to "BLK SHIRT."  Pl.'s Ex.
2 at 2; *see also* Mot. Hr'g Tr. at 47:20-25.

At 12:09 p.m., the calling party hung up and said, "that's all he knows."  Pl.'s Ex. 2 at 2;
Mot. Hr'g Tr. at 47:5-10.  The dispatcher noted, "no veh," Pl.'s Ex. 2 at 2, which Deputy Schlanger
interpreted to mean that the suspect "possibly showed up on foot."  Mot. Hr'g Tr. at 47:11-16.  At
12:10 p.m., the calling party was identified as a neighbor.  *Id.* at 47:17-19.

---

[3] The dispatcher had received the information from the 911 operator, typed it into a system to transmit to the deputies'
computers, and called out the same information over the police radio.  Mot. Hr'g Tr. at 39:17-19, 40:2-7.

At 12:22 p.m., the neighbor called back.  *See id.* at 48:1-6.  At 12:24 p.m., the neighbor asked if the police were on their way, and the neighbor reported that "landlord is there."  *Id.* at 48:4-8; *see also* Pl.'s Ex. 2 at 2.  The dispatcher noted, "asked if house should be vacant … he said no."  Pl.'s Ex. 2 at 2; *see also* Mot. Hr'g Tr. at 48:10-13.  Deputy Schlanger understood this to mean that the "house is actually rented or owned by somebody."  Mot. Hr'g Tr. at 48:10-13.

Deputies Schlanger and Reynolds arrived at the Maplewood Court address shortly after 12:24 p.m.  *See id.* at 74:12-16; 113:22-114:4.  As the deputies walked up to the residence, they encountered a man, later identified as Ronald Douglas, the landlord.  *See id*; *see also* Schlanger Body Worn Camera Video, Pl.'s Ex. 3, at 11:23.  Mr. Douglas pointed toward the residence and said, "he's right up there."  Pl.'s Ex. 3 at 11:23.  Deputy Schlanger asked, "He's not supposed to be here?" *id.* at 11:25, and Mr. Douglas responded, "No, sir."  *Id.* at 11:24-26.  Mr. Douglas also pointed at his "no trespassing" signs on the fence outside the residence.  *Id.* at 11:26-28.  The deputies then walked past Mr. Douglas, through a gate, and toward the residence.  *Id.* at 11:29-40.  The residence is one long building with multiple units and a shared porch.  *See id.*; s*ee* Mot. Hr'g Tr. at 23:14-20.

As the deputies approached the porch, a man on the porch, later identified as Defendant, said, "I'm drinking my coffee.  I'm leaving."  Pl.'s Ex. 3 at 11:40-41.  Deputy Schlanger said, "Hey [inaudible] come here and talk to me for a second."  *Id.* at 11:41-43.  Deputy Schlanger then said, "You're not in big trouble, just come talk to me real quick."  *Id.* at 11:44-46.  Defendant responded, "I don't know nothing…I'm leaving."  *Id.* at 11:48-52.  As they had this conversation, the deputies walked toward the porch, climbed steps to the porch, and entered the porch area.  *See id.* at 11:30-53.

At the time the deputies reached the porch, Deputy Schlanger said, "I've still got to talk to you. Come here." *Id.* at 11:55-57.  Defendant was standing on the porch with one hand extended toward the building and in the other hand, he held a cup.  *Id.* at 11:57-59.  Deputy Schlanger said, "No, you can't go inside. Come here." *Id.* at 11:59.  Defendant asked, "Why not?" *Id.* at 12:01.  The deputies continued to walk toward Defendant, and Deputy Schanger said, "Come here and talk to me." *Id.* at 12:03.  At that point, Defendant was stepping inside the sliding glass door and said, "I don't owe you nothing." *Id.* at 12:04.  Deputy Schlanger said, "Come here and talk to me." *Id.* at 12:05.  The deputies reached the glass door as Defendant closed it.  *Id.* at 12:06.

Deputy Schlanger stood outside, as Defendant stood inside the apartment facing the deputy, holding his cup with one hand and holding the glass door shut with the other.  *Id.* at 12:06-09.  Speaking through the closed glass door, Deputy Schlanger said, "Let go, now." *Id.* at 12:09.  Defendant responded, looking at Deputy Schlanger, "Hey, I don't owe you nothing." *Id.* at 12:10.  Deputy Schlanger repeated, "Let go, now," *id*. at 12:12, and Defendant repeated, "Hey, I don't owe you nothing." *Id.* at 12:14.  Defendant went on, "I don't know nothing…I'm just waiting for my wife." *Id.* at 12:16-12:20.  Deputy Schlanger instructed Defendant: "Back up." *Id.* at 12:21.  To this, Defendant said again, "I'm just waiting for my wife."[4]  *Id.* at 12:21.  At this point, neither Defendant nor Deputy Schlanger was yelling, and Defendant was still holding the door closed.  *Id.*

In a louder, more forceful voice, Deputy Schlanger said again, "Back up." *Id*. at 12:22.  Defendant looked at Deputy Schlanger, opened his mouth, and shook his head slightly.  *Id.* at 12:24.  A second later, Deputy Schlanger pulled the sliding glass door open, and the deputies took Defendant to the ground, ultimately handcuffing him on the floor of the apartment just inside the glass door.  *Id.* at 12:25-13:04; *see also* Mot. Hr'g Tr. at 59:18-61:9 .

---

[4] Deputy Schlanger later testified that from this statement he inferred that Defendant "knows somebody who lives there and that's who he's waiting for, at least that's what he's saying."  Mot. Hr'g Tr. at 58:22-25.

The deputies placed Defendant under arrest for "resisting and obstructing."  Mot. Hr'g Tr. at 62:3-8.  They found a black semiautomatic pistol in his pocket.  *Id.* at 62:12-22.  Deputy Schalnger handed the gun to Deputy Reynolds, who placed it on a nearby table.  *Id.* at 63:1-4. Defendant was then taken to one of the deputies' police vehicles.  *Id.* at 63:8-10.  Defendant was subsequently charged with criminal trespass and receiving a stolen firearm, in addition to the obstruction charge.  *Id.* at 63:14-18.

## LEGAL ANALYSIS

The general issue before the Court is whether the deputies' warrantless entry of the Maplewood apartment was violative of the Fourth Amendment, and if so, whether the motion to suppress should be granted.  "On a motion to suppress, the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *United States v. Goebel,* 959 F.3d 1259, 1265 (10th Cir. 2020).  Defendant bears the initial burden to show his Fourth Amendment rights were implicated, and the Government has the burden to show its conduct was justified.  *Id.* (citations omitted).

Defendant initially argued that the deputies' warrantless entry into the Maplewood apartment was not justified because the deputies did not have probable cause to arrest Defendant outside the apartment or a lawful justification for entering the apartment, both of which he argues were required for the warrantless entry of the residence.  *See* Doc. 26 at 3-6.  At the motion hearing, Defendant maintained the entry was unlawful and that the deputies did not have probable cause to believe Defendant committed a felony but seemed to concede the deputies had probable cause to believe Defendant was committing or had committed criminal trespass, a misdemeanor.  *See* Mot. Hr'g Tr. at 148:1-14; 150:22-24; 169:8-14.

5

The Government responds that the deputies' entry was lawful because the deputies had probable cause to believe that Defendant was committing the crimes of resisting, obstructing, or evading law enforcement and criminal trespass. *See* Mot. Hr'g Tr. at 159:14-23, 166:1-3; *see also* Doc. 27 at 10, 15. Though the Government initially asserted that the deputies had probable cause to believe Defendant was committing a felony residential burglary, its position now appears to be that the deputies did not yet have probable cause of a residential burglary at the time of the warrantless entry because they were still investigating that crime. *See id.* 166:1-3. The Government also argues that the deputies' warrantless entry was lawful because the deputies believed Defendant did not have permission to be inside the apartment and may commit additional crimes and/or damage property, or alternatively, that Defendant may try to flee the apartment before the deputies could obtain a warrant. *See id.* at 159:18-25-160:1-16; *see also* Doc. 27 at 15.

Before analyzing the parties' arguments, the Court first turns to the legal framework governing warrantless home entries.[5]

## I.    Warrantless Home Entries Under the Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.." U.S. Const. amend. IV. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). Indeed, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (quoting *Coolidge v. New Hampshire*, 403

---

[5] The Government also asserted that Defendant lacks standing to invoke Fourth Amendment protections in this case. *See* Doc. 27 at 5. At the motion hearing, the Court heard argument and testimony on this point and ruled that Defendant has standing to object to the deputies' actions in this case. *See* Doc. 34.

U.S. 443, 477 (1971)).  "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

"[E]ven with probable cause, police officers may not enter a dwelling to make an arrest absent consent or exigent circumstances." *United States v. Cruz*, 977 F.3d 998, 1004 (10th Cir. 2020) (citation omitted).  "When analyzing warrantless arrests that begin outside the home and end with police chasing a suspect into his residence, we ask whether police had probable cause to make the arrest in the first place and then whether there were exigent circumstances to justify the officers' intrusion into the home." *Id.*

"Although 'the defendant bears the burden of proving whether and when the Fourth Amendment was implicated,' … '[t]he government then bears the burden of proving that its warrantless actions were justified [by an exception].'" *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020) (quoting *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017)).  "The controlling standard of proof at a suppression hearing is proof by a preponderance of the evidence." *United States v. Shrum*, 908 F.3d 1219, 1229 n.7 (citing *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)). "If the government establishes that an exception to the warrant requirement applies, the search is constitutional." *Neugin*, 958 F.3d at 930 (citing *United States v. Maestas*, 2 F.3d 1485, 1491-92 (10th Cir. 1993)).

Therefore, to determine whether the warrantless entry in this case was lawful, the Court examines first, whether the officers had probable cause to arrest Defendant and second, whether exigent circumstances justified their entrance into his apartment.

## II.    Whether the Deputies had Probable Cause to Arrest Defendant

"A police officer may arrest a person without a warrant if he has probable cause to believe that person committed a crime."  *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).  "Probable

7

cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Jones v. City and County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988). "Probable cause must be evaluated in relation to the circumstances as they would have appeared to a prudent, cautious and trained police officer." *United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986). A determination of probable cause is based on the totality of the circumstances. *See United States v. Williams*, 45 F.3d 1481, 1485 (10th Cir. 1995)

At the motion hearing, Defendant appeared to concede the deputies had probable cause to arrest Defendant for misdemeanor criminal trespass. *See* Mot. Hr'g Tr. at 148:1-14; 150:22-24; 169:8-18. Given this concession, the Court finds the deputies had probable cause to arrest Defendant for misdemeanor trespass. The Government argues the deputies also had probable cause to arrest Defendant for resisting, evading, or obstructing an officer under Section 30-22-1 of the New Mexico Statutes Annotated. *See* Mot. Hr'g Tr. at 134-135; 158:18-25-159:1-17; *see also* N.M. Stat. Ann. § 30-22-1 (1978). Based on Defendant's cross-examination of the deputies at the motion hearing, the Court infers that Defendant disputes that the deputies had probable cause to arrest Defendant for this crime. *See e.g. id.* at 129:7-25-130:1-14.

Under Section 30-22-1, a person resists, evades, or obstructs an officer by, *inter alia*, "intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him" or "resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties." N.M. Stat. Ann. § 30-22-1(B), (D). "Whoever

commits resisting, evading or obstructing an officer is guilty of a misdemeanor."  N.M. Stat. Ann. § 30-22-1.

The deputies had probable cause to arrest Defendant for violating Section 30-22-1 at the point Defendant fled from the porch into the apartment.  *See State v. Gutierrez*, 2007-NMSC-033, ¶ 31 ("While a person has the constitutional right to walk away from an officer who lacks reasonable suspicion and simply wants to question the person, a person who walks away from an officer attempting to detain that person based on reasonable suspicion can be charged with evading and eluding an officer under Section 30-22-1(B).").  Here, when the deputies began calling out to Defendant as they approached the porch, they were attempting to detain Defendant based on reasonable suspicion that he had committed criminal trespass, as they had received information from the landlord that Defendant was not supposed to be on the property.  *See* Mot. Hr'g Tr. at 101:10-25 (deputy describing his requests for Defendant to come speak with him), 147:21-25-148:1-4 (defense counsel summarizing deputies' testimony and characterizing crime as "criminal trespass").  When Defendant fled into the apartment, he walked away from deputies who were attempting to detain him based on reasonable suspicion. Therefore, the deputies had probable cause to arrest Defendant for two misdemeanors before Defendant fled inside the apartment.

Finally, at the motion hearing, the Government implicitly conceded the deputies did not have probable cause to arrest Defendant for residential burglary because they were still investigating that crime.  *See* Mot. Hr'g Tr. at 166:1-3.  But even if the Government did not concede this, the Court nonetheless finds the deputies did not have probable cause to arrest Defendant for residential burglary.

Considering all of the facts available to the deputies at the time they entered the apartment, the Court finds that the totality of the circumstances would not have led a prudent, cautious, and

trained officer to believe a residential burglary had occurred or was occurring.  The deputies were dispatched to a "residential burglary in progress" and received information that a neighbor reported there was someone "taking stuff off the porch" and "out of shed," and that the "landlord once [sic] him out of there."  Pl.'s Ex. 2 at 2.  However, the subsequent information the deputies received and observed did not suggest that a residential burglary was occurring or had occurred.  When the deputies encountered Defendant on the porch, he was standing on the porch holding a drinking cup in one hand and significantly, the deputies did not see *any* signs of burglary – no bags of items, no burglary tools, no signs of forced entry, and no signs of a fight.  *See* Mot. Hr'g Tr. at 79:18-80:25.  He told the deputies at least twice that he was waiting for his wife.  *Id.* at 12:16-12:21. While Deputy Schlanger heard these statements, *see id.* at 84:12-14, 16-17, he did not ask Defendant for his wife's contact information to verify Defendant's presence at the apartment.

The facts in this case distinguish it from the cases cited by the Government.  In one case, officers were dispatched to an apartment and upon arrival were told by a maintenance manager that there was an unwanted person in the apartment.  *See Walker v. Disner*, 50 Fed.Appx. 908, 909 (10th Cir. 2002).  Once the officers arrived at the apartment, they observed signs of burglary and were met with no answer when they knocked on the door.  In contrast, the deputies in this case did not observe *any* signs of burglary when they arrived at the Maplewood apartment, and Defendant was standing on the porch holding a drinking glass when they arrived.[6]  When the deputies asked him to approach them, while he refused, he also told them he was at the apartment to see his wife. The situation here was therefore dissimilar to the situation in *Walker* where no one answered the door, and there were signs of burglary upon the officers' arrival.

---

[6] To the extent the Government relies on *Walker* to argue exigent circumstances existed, Doc. 27 at 11, the Court analyzes the exigency issue below.

In another case, officers were dispatched to a residence and informed that a security alarm inside had been set off, though the security company cancelled the alarm after they were dispatched. *See United States v. McCullough*, 457 F.3d 1150, 1156, 1164 (10th Cir. 2006). Under department protocol, the officers still had a responsibility to investigate and, in the event the alarm was in fact cancelled, had to ensure it was the real owners who had cancelled it. *See id.* When the officer arrived, she met two "unusually dirty" people, neither of whom had any identification, who admitted to not being the homeowners, did not know the name of the owners, and were acting nervous. *Id.* When the officer had arrived, she had seen one of the people leaving the house, not making an attempt to speak to the officer, and acting disoriented. *Id.* On these facts, the Tenth Circuit concluded the officer had probable cause to believe a burglary was in progress. *Id.* And, importantly, none of the subsequent events lessened the officer's suspicion. *Id.* One of the suspected burglars told the officer she had spoken with the homeowner and reset the alarm panel, but the officer had already determined that the panel had not actually been reset. *Id.* at 1165. The officer allowed the suspected burglar to call someone who the burglar claimed was the homeowner, but the man who answered denied to the officer that he was the owner. *Id.* The burglar called a second person who also spoke to the officer, and this second person was "surprised" the "alarm was going off (despite [the burglar] allegedly having already spoken to her about the problem)" and refused to tell the officer if the two people in the house had authority to be there. *Id.* These events only increased the officer's suspicion that a burglary was in progress.[7] *Id.*

In contrast to the substantiating facts on-scene in *McCullough*, when the deputies in this case arrived at the Maplewood apartment, the facts did not substantiate a belief that a residential burglary was in progress. The deputies did not observe any signs of burglary. *See* Mot. Hr'g Tr.

---

[7] Again, to the extent the Government relies on this case for its exigent circumstances argument, the Court analyzes that issue below.

at 80:2-4.  They did not see signs of forced entry.  *See id.* at 80:9-11.  They did not observe burglary

tools.  *See id.* at 80:7-8.  And while Defendant did not approach the deputies in this case, he

engaged with them and repeatedly told them he was at the apartment waiting for his wife.[8]  In

contrast to the "unusually dirty," "nervous," and one apparently silent, suspects in *McCullough*

who admitted not to know the homeowner, *id.* at 1164, Defendant was holding a drinking glass,

stated he was waiting for his wife, his demeanor suggested his frustration with being questioned

by the officers, and there were no signs of a burglary.  Unlike the facts in *McCullough*, these facts

did not create probable cause of a residential burglary.

In sum, at the time Defendant fled inside the apartment, the deputies had probable cause to

arrest Defendant for trespass and resisting, evading, or obstructing an officer, both misdemeanor

offenses, but not for felony residential burglary.

## III.   Whether Exigent Circumstances Justified the Warrantless Entry into Defendant's Apartment

The next question is whether exigent circumstances existed that made the deputies'

warrantless entrance into the apartment lawful.   The exigent circumstances exception to the

warrant requirement "applies when 'the exigencies of the situation' make the needs of law

enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth

Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394

(1978)) (alteration in original).   "The exception enables law enforcement officers to handle

'emergenc[ies]'—situations presenting a 'compelling need for official action and no time to secure

---

[8] While the Court will not find that the deputies should have asked Defendant more questions about his wife and his reason for being at the apartment, the Court notes that the officer in *McCullough* did take the time to allow the suspect to make two separate phones calls in an attempt to confirm the suspect's authority to be at the home.  The reason this was significant because the outcome of those phone calls only served to corroborate the officer's suspicions.

a warrant.'" *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Riley v. California*, 573

U.S. 373, 402 (2014)). The Supreme Court has recognized several types of exigent circumstances:

> An officer, for example, may enter a home without a warrant to render emergency
> assistance to an injured occupant, to protect an occupant from imminent injury, or
> to ensure his own safety . . . So too, the police may make a warrantless entry to
> prevent the imminent destruction of evidence or to prevent a suspect's escape . . .
> In those circumstances, the delay required to obtain a warrant would bring about
> some real immediate and serious consequence—and so the absence of a warrant is
> excused.

*Id*. at 2016 (citations and internal quotation marks omitted; alterations incorporated). "The burden

is on the government to demonstrate the existence of exigent circumstances." *Mascorro v.*

*Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011). "[E]xceptions to the warrant requirement are few

in number and carefully delineated, and ... the police bear a heavy burden when attempting to

demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*,

466 U.S. 740, 749–50 (1984) (internal quotation marks and citation omitted). "Before agents of

the government may invade the sanctity of the home, the burden is on the government to

demonstrate exigent circumstances that overcome the presumption of unreasonableness that

attaches to all warrantless home entries." *Id.* at 750 (citing *Payton*, 445 U.S. at 586). "That burden

is especially heavy when the exception must justify the warrantless entry of a home." *United States*

*v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006) (citing *United States v. Anderson*, 981 F.2d 1560,

1567 (10th Cir.1992)).

To determine whether exigent circumstances existed, courts "evaluate whether the officers

were confronted with reasonable grounds to believe there was an immediate need guided by the

realities of the situation presented by the record from the viewpoint of prudent, cautious, and

trained officers." *Najar*, 451 F.3d at 718–19 (citation and internal quotation marks omitted). "The

inquiry determining the existence of an exigency is essentially one of reasonable belief." *Id.* at

719. "Reasonable belief does not require absolute certainty; the standard is more lenient than the

probable cause standard." *McInerney v. King*, 791 F.3d 1224, 1232 (10th Cir. 2015) (citation

omitted). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual

officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'"

*Brigham City*, 547 U.S. at 404 (alteration in original) (quoting *Scott v. United States*, 436 U.S.

128, 138 (1978)).

     The Government has presented several exigent circumstances theories. It argues, "[t]aking

the time to obtain a warrant would have allowed the defendant to" first, "leave from the residence,

as he said he was going to do" and second, "remain inside another person's home where he was

not supposed to be where he could potentially commit additional crimes and/or damage property."[9]

Doc. 27 at 15. The Government argues exigent circumstances existed under the hot pursuit theory,

*see* Mot. Hr'g Tr. at 161:16-19, and because the deputies,

> think he's in someone else's house, and they don't know who is in that house. And
> they – you know, that's why. And they don't know if he's gonna arm himself in that
> house, if he's gonna burn down the house. And I say this not to be an alarmist, but
> this is why these are valid concerns. That's why. That's why it's exigent, because
> him being in the house is a continuation of a residential burglary.

Mot. Hr'g Tr. at 163:8-14. Defendant Schlanger testified that he opened the glass door

> after gauging the suspect's compliance and him refusing to come even speak to me
> and fearing that he may retreat further into the residence, arm himself, be a danger
> to whoever may be inside or even myself, I decided to go ahead and open the door
> and take him into custody.

*Id.* at 58:12-16. He testified he was concerned there may be "domestic violence" issues because

Defendant said he was waiting for his wife. *Id.* at 59:4-8. And finally, he testified he had concerns

that "there could be somebody that may need assistance in the back, he may be holding somebody

---

[9] At the motion hearing, the Government described this second reason in the following way: "[a]nd in the context of,
you know, a criminal trespass or a residential burglary, that's the exigency, that you had a person in somebody's home
that wasn't supposed to be there." Mot. Hr'g Tr. at 160:5-8.

against their will, and just general fear for the safety of whoever else may be inside." *Id.* at 59:12-15.

Defendant argues the hot pursuit exception only applies when officers are in "immediate and continuous pursuit of the subject only from the scene of a serious crime" and asserts there is no evidence Defendant had committed a serious crime. Doc. 26 at 5. Defendant also argues there is no evidence to support a suspicion that Defendant was armed, that anyone else was inside the apartment, or that Defendant would harm anyone. *See id.* Defendant also argues there was no reason for the deputies to believe Defendant possessed evidence that could be destroyed before the deputies could obtain a warrant. *See id.* at 6.

In support of its argument, the Government refers to *United States v. Santana*, where the Supreme Court held that the defendant's "act of retreating into her house" could "not defeat an arrest" that had "been set in motion in a public place." 427 U.S. 38, 42-43 (1976). In that case, police drove to the defendant's house with probable cause to believe the defendant was dealing drugs, a felony. *Id.* at 40-41. When the officers arrived, they saw the defendant standing in the doorway of her home, fifteen feet away. *Id.* at 40. The officers yelled "police," and the defendant retreated into her house. *Id.* The officers followed the defendant inside and found drugs in a bag she was holding. *Id.* at 41.

The Government correctly notes that *Santana* involved a fleeing felony suspect, and it refers to the Supreme Court's recent decision in *Lange*, 141 S.Ct. 2011, but asserts the main difference between the facts in *Lange* and the facts here are that the deputies in this case reasonably believed Defendant was retreating into someone else's home   Doc. 27 at 14-15. But the key holding of *Lange* is that, when in pursuit of fleeing misdemeanants, the sanctity of the home can

15

only be breached when the circumstances present a law enforcement emergency.  *See* 141 S.Ct. at 2019, 2024.

In *Lange*, the Court declined to adopt a categorical rule allowing warrantless home entry when in hot pursuit of fleeing misdemeanants and explicitly rejected a "flat rule permitting warrantless home entry when police officers (with probable cause) are pursuing any suspect— whether a felon or a misdemeanant."  141 S.Ct. at 2019.  The Court stated, "[a]ssuming *Santana* treated fleeing-felon cases categorially (that is, as *always* presenting exigent circumstances allowing warrantless entry)…it still said nothing about fleeing misdemeanants."  *Id.* (emphasis in original).  The Court noted that when "a minor offense alone is involved, police officers do not usually face the kind of emergency that can justify a warrantless home entry" but, significantly,

> [a]dd a suspect's flight and the calculus changes—but not enough to justify [a] categorial rule.  We have no doubt that in a great many cases flight creates a need for police to act swiftly.  A suspect may flee, for example, because he is intent on discarding evidence.  Or his flight may show a willingness to flee yet again, while the police await a warrant.  But no evidence suggests that every case of misdemeanor flight poses such dangers.

*Id.* at 2021.  The Court cautioned that "misdemeanors can target minor, non-violent conduct" and, in describing a prior holding, "when that is so, officers can probably take the time to get a warrant.  And at times that will be true even when a misdemeanant has forced the police to pursue him (especially given that 'pursuit' may cover just a few feet of ground…)."  *Id*. The Court summarized:

> Fourth Amendment precedents thus point toward assessing case by case the exigencies arising from misdemeanants' flight. That approach will in many, if not most, cases allow a warrantless home entry. When the totality of circumstances shows an emergency—such as imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home—the police may act without waiting. And those circumstances … include the flight itself.  But the need to pursue a misdemeanant does not trigger a categorical rule allowing home entry, even absent a law enforcement emergency. When the nature of the crime, the nature

of the flight, and surrounding facts present no such exigency, officers must respect the sanctity of the home—which means that they must get a warrant.

*Id.* at 2021-2022 (footnote omitted).

Finally, "[a]n officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency." *Id.* at 2024. Law enforcement must "reasonably believe [something] harmful will happen in the time it takes to get a warrant." *Lange*, 141 S.Ct. at 2021 n.3; *see also United States v. Aquino*, 836 F.2d 1268, 1273 (10th Cir. 1988) ("in order to justify a warrantless entry, the police had to have a reasonable basis for believing that suspects would destroy evidence within three hours," which was the amount of time officers estimated it would take to obtain a warrant).

The framework of *Lange* controls this case because Defendant was a fleeing misdemeanant, as the deputies had probable cause to arrest him for two misdemeanors at the time he entered the apartment. Therefore, the deputies' warrantless entry of the apartment was lawful if their pursuit of Defendant was based on a law enforcement emergency, specifically, prevention of imminent harms of violence, destruction of evidence, or escape from the home. *Lange*, 141 S.Ct. at 2024.

Here, the Government has not shown that the totality of the circumstances created an emergency that justified the deputies entering the apartment. First, the evidence does not show that the deputies had reasonable grounds to believe that they needed to immediately enter the apartment to prevent imminent harms of violence. "In determining whether the risk of personal danger creates exigent circumstances, [the court uses] a two-part test: whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014) (citation and internal quotation marks omitted). "The

emergency aid exception depends on an objectively reasonable basis for believing that a person within the house is in need of immediate aid, not on an officer's subjective belief." *United States v. Martinez*, 643 F.3d 1292, 1296 (10th Cir. 2011). Some recognized imminent-harm exigencies are preventing suicide, *see United States v. Shively*, 9 F. App'x 884, 885 (10th Cir. 2001), and ameliorating the danger posed by an occupant who is armed and known to shoot at police. *See United States v. Gay*, 240 F.3d 1222, 1228-29 (10th Cir. 2001). And, while "911 calls are the predominant means of communicating emergency situations," the Tenth Circuit has not held "that a response to a 911 call will always justify a warrantless entry upon the arrival of law enforcement." *Najar*, 451 F.3d at 719, 720 n.7.

Turning to the first prong of the two-part imminent danger test, the evidence does not show that the deputies in this case had reasonable grounds to believe there was an immediate need to protect the lives or safety of themselves or others. This is because the facts of this case stand in contrast to the facts of cases where the Tenth Circuit has found officers had reasonable grounds to believe there was an immediate need to enter a residence to prevent harm or provide aid. In *United States v. Thomas*, the Court found exigent circumstances justified a warrantless entry because the officers were

> faced a situation in which there were firearms inside the home, it was unclear how many people were inside the home, and the circumstances gave rise to a reasonable fear that the firearms might be used against the officers or others. The officers had just broken up a heated argument in which a firearm had been brandished, one of the participants in that argument had defied police orders and stashed the gun in a rear area of the apartment, and the officers had no way of knowing if there were others in the apartment with access to the gun.

372 F.3d at 1177-78. In *United States v. Rhiger*, the Court found there were reasonable grounds for agents to believe there was an immediate need to protect themselves and the public from "potential explosion of a methamphetamine lab in [co-defendant's] home" because the

Government's case included evidence of the co-defendants' "purchase and possession of materials used to manufacture methamphetamine, the strong odor of cooking methamphetamine emitting from the [] residence, and Agent Mallory's knowledge of the inherent dangerousness of an active methamphetamine lab."  315 F.3d 1283, 1289 (10th Cir. 2003).

In *United States v. Martin*, the Tenth Circuit found exigent circumstances existed to make a warrantless home entry.  613 F.3d 1295 (10th Cir. 2010).  Officers had received a call someone had been shot in the chest.  *See id.* at 1298.  Witnesses on scene identified the shooter and stated he had fled on foot "with the guns he had used in the shooting."  *Id.*  Officers obtained a photo of the suspect's girlfriend and arrived at her apartment building about four hours after the shooting to get a statement from her.  *See id.*  The main apartment door was locked, but officers heard voices approaching the door, and when the door opened, the officers then spoke with a man, the defendant, who was accompanied by a woman matching the photograph of the girlfriend.  *See id.*  The defendant gave the officers the name they had previously determined was the name of the suspect, and simultaneously, the defendant began stepping back inside the apartment building's atrium. *See id.*  The officers identified themselves as law enforcement and ordered the defendant to put his hands on the wall behind him.  *See id.*  The defendant did not; instead, he dropped his hands "out of sight."  *See id.*  With his hands out of sight, he said "[I] have something on [me]."  *Id.*  The officer interpreted this to mean he had a firearm, so the officer entered the apartment atrium and placed the defendant in handcuffs.  *Id.*  The Court found exigent circumstances existed because, given that officers "had come face to face with a man who had likely shot someone else earlier in the day, who claimed he had a gun on him, and who, after being told to place his hands on the wall, dropped his hands from sight. In these circumstances, the officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect [their] safety." *Id.*

at 1304 (citing cases where warrantless entry permitted where a defendant announced he had a gun and where a defendant brandished a gun).

In contrast, the facts here do not indicate there were reasonable grounds for believing the deputies needed to act immediately to prevent harm to themselves or others. The deputies did not have any information that Defendant was armed, either from the 911 call via dispatch or from the circumstances when they arrived on scene. Neither the neighbor who called 911 nor the landlord on scene suggested Defendant was violent or had injured anyone. When the deputies encountered Defendant, they had an unobstructed view of his hands; he held no weapons, only a drinking cup, which is insufficient to justify exigent circumstances based on officer safety. Deputy Schlanger's testimony that he was concerned about domestic violence, that somebody inside could need assistance, or his "general fear for the safety of whoever else may be inside" does not establish the officers were confronted with reasonable grounds to believe there was an immediate need to enter.[10] There was no evidence indicating someone else was inside, and, in contrast to the deputy's stated concern for the safety of other potential occupants, neither deputy subsequently did a sweep of the apartment to check for other occupants, making the deputy's stated concern about safety somewhat less credible.[11] *See* Mot. Hr'g Tr. 86:8-87:12. The deputies did not see anyone else inside the apartment or have reason to believe that there was someone else inside. *See United States v. Mora*, 989 F.3d 794 ("officers had no reason to believe that anyone was in the home when

---

[10] While the Court considers whether there was an objectively reasonable basis, rather than relying on an officer's "subjective belief," *Martinez*, 643 F.3d 1292, Deputy Schlanger's concerns are not entirely consistent with the record. Deputy Schlanger spoke to medical personnel on scene after arresting Defendant and when describing the encounter with Defendant, Deputy Schlanger said that Defendant had gone inside, but "nobody holds the door shut on me." Mot. Hr'g Tr. at 96:27-97:16. This makes Deputy Schlanger's testimony that he was concerned about potential occupants in the apartment less consistent with the other record evidence because this statement suggests that was not the reason he entered the apartment.

[11] Deputy Reynolds returned to the apartment to retrieve the firearm that he had placed on a piece of furniture after seizing it from Defendant subsequent to his arrest, but the deputy did not check the apartment for other occupants. *See* Mot. Hr'g Tr at 122:1-123:13.

they entered without Defendant's permission or a warrant…no officer noticed any signs of other people from inside the home. Without evidence suggesting anyone was in the home, let alone in need of aid, officers fail to meet their burden of identifying exigent circumstances to justify their warrantless search of the home"). The Court need not address the manner and scope of search under the second prong of the two-part test because the evidence does not show there were reasonable grounds for believing there was a need to enter prevent imminent harm to the deputies' or others.

Next, the evidence does not show that there were reasonable grounds to believe evidence would be destroyed if the deputies had to wait for a warrant. Though Deputy Schlanger testified that when he arrived on scene he needed to speak with Defendant immediately because he was "potentially a suspect in a felony crime, and I needed to make sure I made contact with him before he fled or any evidence could be destroyed," Mot. Hr'g Tr. at 53:23-25-54:1, there is not a single allegation that Defendant possessed any sort of evidence at the time the deputies entered the apartment. Therefore, the deputies did not have a reasonable basis to believe this type of exigency existed.

Third, the evidence does not show that the deputies had an objectively reasonable belief that Defendant would escape from the home if they did not enter immediately. When Defendant entered the apartment, he remained at the glass door, facing the deputies. He did not run into a back room or out of sight. Additionally, the deputies had the means to call additional deputies to establish a perimeter around the house to prevent Defendant's escape. *See id.* 57:12-17; 118:11-20. After surrounding the building, Deputy Reynolds testified they could then "execute a possible warrant." [12] *Id.* at 118:11-20. All of this indicates that the Government has not met its burden to

---

[12] Deputy Schlanger also testified that if Defendant refused to exit the apartment and the deputies had to "set up a perimeter to contain the scene" and "call in more deputies to help us with that perimeter … it could potentially escalate

show there were reasonable grounds to believe immediate entry was required to prevent Defendant from escaping.

The Government relies on several cases for the idea that exigent circumstances existed because the deputies were investigating a burglary. *See* Doc. 27 at 11. The Government relies on *McCullough*, 457 F.3d 1150, to support its argument that the deputies' entry was pursuant to exigent circumstances because it occurred during their burglary investigation. Relying on sister circuit precedent, the Tenth Circuit in *McCullough* found that if the "factual circumstances confronting [an officer] were sufficient to give her probable cause to believe that a burglary was in progress at the residence" then the officer could enter under the exigent circumstances exception. *Id.* at 1164. Because the officer had probable cause that the defendant was committing a burglary, the Court affirmed the trial court's finding that exigent circumstances justified the warrantless home entry. *Id.* at 1165. The officer had a reasonable basis to believe that leaving the scene would have risked allowing the burglary continue, thus jeopardizing the homeowners property and allowing the "two obvious burglary suspects" to escape. *Id.* at 1164-1165. These facts gave the officer a "reasonable basis for concluding the warrant requirement was impractical." *Id.* at 1165.

Here, the deputies did not have probable cause to believe a burglary was in progress, as described above. The facts at the Maplewood apartment did not create a reasonable belief that there was an emergency inside the apartment because there were no signs of a burglary when the officers arrived. *See United States v. Martinez*, 643 F.3d 1292 (10th Cir. 2011) (finding no exigent

---

to a SWAT team situation." Mot. Hr'g Tr. at 57:14-18. The Government relies on this to argue that the "simple action of going just immediately into the house to effectuate this arrest…is not violative of the Fourth Amendment" because the only other alternative, in essence, would turn the encounter into a dangerous SWAT situation. *See id.* at 165:6-25. While the Government's desire to prevent a dangerous SWAT situation is understandable and commendable, its concern is too speculative given the facts in this case. It does not cite authority that allows this Court to find exigent circumstances exist when a warrantless entry could *potentially* prevent a SWAT situation.

circumstances and finding *McCullough* inapposite because facts at house in *McCullough* substantiated belief that burglary was in progress, but facts before *Martinez* Court did not create reasonable belief of emergency in home because there were no signs of anyone in home, no signs of forced entry, no cars near house, and gate to property was closed).  And even if this Court were to assume the facts indicated there was an emergency inside the home, they did not have a reasonable basis to conclude the warrant requirement was impractical.  This is because both deputies testified they could have had additional deputies dispatched to the apartment to surround the building and establish a perimeter.  Mot. Hr'g Tr. 57:12-17; 118:11-20.  Deputy Reynolds testified they could then "execute a possible warrant."  *Id.* at 118:11-20.  As a result, *McCullough* does not authorize the deputies' warrantless entry on the facts of this case.

The Government also cites *Illinois v. Wardlow*, 528 U.S. 119 (2000), and *United States v. Shelton*, 817 F. App'x 629, 632 (10th Cir. 2020), in support of its exigent circumstances argument. *See* Mot. Hr'g Tr. at 161:13-25-162:1-21; *see also* Doc. 27 at 9.  In *Wardlow*, the Court found that police officers had reasonable suspicion to support an investigatory detention on a public street in a high-crime area after a defendant fled from officers.  528 U.S. at 122-124.  The Court was not addressing warrantless home entries.  But perhaps more significantly, this Court is not assessing whether Defendant's flight gave the deputies here reasonable suspicion because the Court has already found they had probable cause to arrest Defendant at the time he was inside the apartment. *Wardlow* does not add support to the Government's argument that exigent circumstances existed. In *Shelton*, the Tenth Circuit found that an officer's warrantless entry onto private property was lawful pursuant to exigent circumstances.  *See* 817 F. App'x at 633.  *Shelton* does not make the deputies' actions in the instant case lawful because it was based on the pre-*Lange* hot pursuit framework and thus does not consider the Supreme Court's holding that the Fourth Amendment

requires a case-by-case assessment of exigent circumstances when it comes to fleeing misdemeanant's, as described above.  This Court cannot ignore *Lange* in favor of *Shelton*'s hot pursuit finding.

Next, the Government relies on *Walker v. Disner.*  50 Fed.Appx. 908.  There, the Tenth Circuit found the officers' warrantless entry into an apartment was authorized under the "emergency exception" to the warrant requirement because the officers "had received a burglary call, and upon arriving at the apartment, observed signs of burglary" and no one answered the door when officers knocked.  *Id.* at **1-2.  The *Walker* Court relied on *United States v. Tibolt*, 72 F.3d 965, 970-71 (1st Cir. 1995), for its holding.  *See* 50 Fed.Appx. at *2.  In *Tibolt*, a residential security alarm was activated, the security company could not reach the homeowners, and so police were dispatched.  *Id.* at 967.  Relevant here, officers arrived at the residence and found an unlocked door.  *Id.*  One officer opened the door and called out, but did not receive a response.  *Id.*  The First Circuit found exigent circumstances existed because, without entering the residence, the officer could not know whether "an intruder had managed to get into the residence, and even injured or captured a resident, then fled; or had been caught off guard by the police and remained in the residence with a forcibly detained resident."  *Id.* at 970.  The First Circuit reasoned that under the circumstances, an officer could reasonably conclude that there was "an imminent risk to the lives or safety of the public…or to an injured or immobilized resident."  *Id.* at 971 (citations and internal quotation marks omitted).

The facts in this case are different from those in both *Walker* and *Tibolt*.  In contrast to officers arriving at a residence where no one answered the door and there were signs of burglary, the Defendant in this case engaged with the deputies as soon as they arrived and there were no signs of burglary.  Certainly, Defendant did not readily comply with the deputies' requests, but in

light of the case law, the relevant fact is that he interacted with the deputies; this was not a case where deputies arrived to a silent home where a burglary suspect could be lurking inside. There were no signs of burglary or forced entry, and there was no indication someone else might be inside the home. Under these facts, the Government has not shown that the deputies had an immediate need to open the door.

The deputies did not have an objectively reasonable basis for believing there was some other emergency that required their immediate entry. The deputies did not have information that shots had been fired at the apartment property. Mot. Hr'g Tr. at 76:5-6. The deputies did not see any bodies or blood inside the apartment. *Id.* at 76:7-8. There was no indication that any crime, besides the trespass and resisting, had occurred. *Id.* at 80:22-25. The evidence does not support an objectively reasonable belief that Defendant "could potentially," Doc. 27 at 15, commit other crimes, damage property,[13] arm himself, or burn the apartment down. *See* Mot. Hr'g Tr. at 163:8-12; *see also Martinez*, 643 F.3d at 1299–300 ("The sanctity of the home is too important to be violated by the mere possibility that someone inside is in need of aid—such a "possibility" is ever-present."). Given all of the facts, this is the type of a case where, "when the officer has time to get a warrant, he must do so—even when the misdemeanant has fled." *Lange*, 141 S.Ct. at 2024. Accordingly, the Court finds the warrantless entry into the Maplewood apartment was not justified and was a violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

## IV.    Application of Exclusionary Rule

---

[13] The Government does not provide binding authority that preventing destruction of "property," as distinct from "evidence," creates an exigent circumstance. Additionally, the initial 911 call did not report that Defendant was destroying property, and upon their arrival, the evidence does not show that the deputies observed that property had been or was in danger of being destroyed.

Defendant argues that all physical evidence and statements that the Government obtained in violation of his Fourth Amendment rights should be suppressed as fruit of the poisonous tree. Doc. 26 at 6-7.  Defendant asserts that the "discovery of the physical evidence in this case occurred in the immediate aftermath of, and directly resulted from, the constitutional violations." *Id.* at 7. The Government maintains that there was not a Fourth Amendment violation.  Doc. 27 at 20.

Under the exclusionary rule, the prosecution may not use evidence obtained in violation of the Fourth Amendment. *See United States v. Esquivel-Rios*, 786 F.3d 1299, 1306 (10th Cir. 2015). Importantly, "[t]he fact that a Fourth Amendment violation occurred ... does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).

"A defendant has the initial burden of establishing a causal connection between an illegal seizure and the evidence he seeks to suppress." *United States v. Shrum*, 908 F.3d 1219, 1233 (10th Cir. 2018) (citation omitted).   "To satisfy the threshold causation requirement, a defendant need only show that 'the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'" *United States v. Suggs*, 998 F.3d 1125, 1142 (10th Cir. 2021) (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)).   Here, that requirement is met because the firearm at issue was found in Defendant's pocket incident to his arrest inside the apartment.  The firearm would not have come to light but for the Government's unlawful warrantless entry.[14]

However, even if a defendant establishes "but for" causation, the Government may still avoid suppression. *See United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).  "[T]he

---

[14] Defendant requests suppression of "all evidence obtained as a result of [Defendant's] seizure," Doc. 26 at 1, and "all physical evidence and statements obtained as a result of the above constitutional violations." *Id.* at 7.  However, the Court is without information about what other evidence or statements, apart from the firearm, were obtained from Defendant.  As a result, its analysis is limited to the firearm.

relevant inquiry becomes whether the Government has proven the incriminating evidence was discovered by means sufficiently distinguishable from the initial illegality to be purged of the primary taint." *Shrum*, 908 F.3d at 1233.  "The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1109 (10th Cir. 2006).  Here, the Government has not argued that any of the exceptions to the exclusionary rule applies.  The Government has not shown that the firearm was discovered by means sufficiently distinguishable from the unlawful warrantless entry.  As a result, the Court finds the firearm must be suppressed.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Suppress Statements and Physical Evidence and Request for an Evidentiary Hearing (Doc. 26).

DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE